**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**KEVIN WHITFIELD,**

> **Plaintiff,**

**vs.**                                                    **Case No. 1:13cv199-MP/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

> **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

This is a Social Security case referred to the undersigned United States Magistrate

Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule

72.2(D).    It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final

determination of the Acting Commissioner (Commissioner) of the Social Security

Administration (SSA) denying Plaintiff's application for a period of disability and Disability

Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and application for

Supplemental Security Income (SSI) under Title XVI of the Act.    After careful

consideration of the record, it is recommended that the decision of the Commissioner be

affirmed.

## I.  Procedural History

On September 27, 2010, Plaintiff, Kevin Whitfield, filed applications for DIB and SSI initially alleging disability beginning November 20, 2009, and based on a six-year old work-related neck injury and hypertension.   R. 13, 181-89, 220, 224, 319.   (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)   Plaintiff filed previous applications for benefits that were denied by another Administrative Law Judge (ALJ) on November 19, 2009. R. 39, 219-20.[1]   The ALJ's 2009 decision is not in the record.   Plaintiff's last date of insured status for DIB is June 30, 2011.   R. 13.

Plaintiff's claims were denied initially on November 30, 2010, and on reconsideration on February 24, 2011.   R. 13, 88-91.   On April 5, 2011, Plaintiff requested a hearing.   R. 13.   On August 9, 2011, Plaintiff's representative, Pamela C. Dunmore, a non-attorney representative, with the law firm of N. Albert Bacharach, Jr., P.A., requested the ALJ to ask Janet K. Humphreys, Ph.D., to fill-out a Mental Residual Functional Capacity Assessment for Plaintiff.   R. 170-74.   (Dr. Humphreys performed a consultative examination of Plaintiff on November 17, 2010.   R. 570-72; *see infra* at 16-17.)   During the evidentiary hearing, the issue was discussed in the context of Plaintiff's treatment at Meridian Behavioral Healthcare, Inc. (Meridian) in 2007.   R. 34-37, 78.   ALJ Flanagan denied this request "based on the availability of mental RFC

---

[1]   ALJ Brendan F. Flanagan, the ALJ who entered the decision in this case, stated that Plaintiff requested a hearing in his prior case, but the case "was dismissed due to abandonment on November 19, 2009[,] because he did not appear at the scheduled hearing."   R. 18.

assessments provided by the state agency consultants."   R. 20 n.2.   Plaintiff does not

take issue with this ruling.   Doc. 16.

On February 15, 2012, ALJ Flanagan held an evidentiary hearing in Jacksonville,

Florida.   R. 13, 27-79.   Plaintiff testified.   R. 39-73, 75.   Robert N. Strader testified as

an impartial vocational expert.   R. 13, 73-77, 169 (Resume).   Ms. Dunmore represented

Plaintiff at the hearing.   R. 13, 110-12.

On April 27, 2012, the ALJ entered a decision concluding that Plaintiff was not

disabled.   R. 20.   On September 12, 2013, the Appeals Council denied Plaintiff's

request for review, R. 8-9, and the ALJ's decision became the Commissioner's final

decision.   R. 1-3; *see* 20 C.F.R. § 404.981.   On October 10, 2013, Plaintiff filed a

Complaint in this Court and seeks judicial review of the Commissioner's decision.   Doc.

1.   Both parties filed memoranda of law, which have been considered.   Docs. 16 and 17.

## II.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial

evidence is more than a scintilla, but less than a preponderance.   It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual

findings are conclusive if supported by substantial evidence."   Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[2]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"   Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).   A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[3]

---

[2]   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."   Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (citations omitted).   "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.   A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).   "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"   Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

[3]   The relevant DIB and SSI regulations are virtually identical.   As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599,

Both the "impairment" and the "inability" must be expected to last not less than 12 months.

Barnhart v. Walton, 535 U.S. 212 (2002).   In addition, an individual is entitled to DIB if he

or she is under a disability prior to the expiration of his insured status.   *See* 42 U.S.C. §

423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human

Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human

Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.   20 C.F.R.

§ 404.1520(a)(4)(i)-(v):

1.   Is the individual currently engaged in substantial gainful activity?[4]

2.   Does the individual have any severe impairments?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.   Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[5]

5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the

application for benefits.   A positive finding at step three results in approval of the

---

unless a SSI regulation provides otherwise.   The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

[4]   *See* 20 C.F.R. § 404.1572.

[5]   A residual functional capacity (RFC) is the most a claimant can still do despite his or her limitations.   20 C.F.R. § 404.1545(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.   *Id.*   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 404.1546(c).

application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.   Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden then shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R.

§ 404.1520(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."   Wilson v. Barnhart, 284 F.3d at 1227 (citation omitted); *see also* Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).   The ALJ is not required, however, to include findings in the hypothetical that the ALJ has properly rejected as unsupported. *See* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004); McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

### III.   Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant meets the insured status requirements of the Social Security Act through June 30, 2011."   R. 15.

2.  "The claimant has not engaged in substantial gainful activity since November 20, 2009, the alleged onset date."   *Id.*

3.  "The claimant has the following severe impairments: status post cervical fusion and depressive disorder."   *Id.*

4.  "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   R. 15-16.   The ALJ determined, in part, that Plaintiff's "mental impairment does not meet or medically equal the criteria of listing 12.04" (affective disorders).   R. 16.   The ALJ found that Plaintiff has *mild* restriction in activities of daily living, *moderate* difficulties in social functioning and with regard to concentration, persistence or pace, and *no* episodes of decompensation, which have been of extended duration.   *Id.*

5.  "[T]he claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant is limited to simple, routine, repetitive tasks and is able to concentrate/persist for two hour segments.   The claimant is further limited to work that requires occasional changes in work settings.   He can only perform work that requires occasional interaction with the public, co-workers and supervisors and is unable to meet fast-paced, high-production demands."   R. 17.

6.  "The claimant is capable of performing past relevant work as a dump truck driver (D.O.T. #902.683-010), a medium, unskilled job, SVP of 2.   This work does not require the performance of work related activities precluded by the claimant's [RFC]."[6]   R. 20.   The ALJ did not proceed to step five.   *Id.*

---

[6]   "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. § 404.1568(a).   An SVP of 1 means a "[s]hort demonstration only."   Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.   An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month." *Id.*   "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.   If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(a).

7.  "The claimant has not been under a disability, as defined in the Social Security Act, from November 20, 2009, through the date of" the ALJ's decision.   *Id.*

## IV.   The Medical and Other Evidence

As noted above, Plaintiff previously applied for benefits that were denied by another ALJ on November 19, 2009.   *See supra* at 2 n.1.   As a result, Plaintiff's alleged onset date is November 20, 2009.   R. 13.   Evidence (some of which is relied on by Plaintiff, *see* doc. 16 at 5-7) that pre-dates the alleged onset date is discussed herein for background purposes.

On December 7, 2004, Plaintiff presented to Shands at AGH, Gainesville, Florida. R. 330.   Steven A. Reid, M.D., explained Plaintiff's problems: "[W]ith a history of intractable cervicobrachial pain.   These symptoms did not respond to conservative treatment.   Preoperative neuroradiologic evaluation included MRI scan which revealed C4-5 disk herniation with cord flattening and increased signal within the cord and a spondylotic ridge as C6-7 with resultant spinal canal compromise with a right paracentral intraforaminal disk herniation with cord compression."   *Id.*[7]   On the same date, Plaintiff

---

[7]   On admission, Plaintiff reported his chief complaints were neck pain and headaches.   R. 334.   "He reported his symptoms began with a work-related motor vehicle accident on May 4, 2004, when his truck brakes locked causing the truck to flip onto its side.   He reported he has no recall of the accident itself.   He had neurologic follow-up for post concussive headaches.   He denies sphincter dyscontrol.   He noted numbness affecting his right hand."   *Id.*   Plaintiff's past history included surgery for right hand fracture remotely; a review of systems included no neurosurgical significance.   *Id.* Plaintiff had previously been examined by Dr. Reid on November 16, 2004, for the same condition.   R. 388-89.   Plaintiff visited the emergency department at Shands at AGH on May 8, 2004, complaining of blurred vision and headache.
R. 417, 428.   A patient note indicates that Plaintiff was to return to work on May 11, 2004. R. 416.

underwent "C4-5 and C6-7 anterior microsurgical diskectomies, facetectomies and allograft arthrodesis.   Postoperatively, he had an uncomplicated course.   At the time of this dictation, he ambulates well and tolerates regular diet.   I have instructed him regarding wound care and precautions and the use of his Aspen collar.   I have scheduled routine follow-up in my office in one week.   I have given him a prescription for Percocet 5/325, one to two p.o. q.4h p.r.n., dispensing #50."   *Id.*

On February 18, 2005, Dr. Reid referred Plaintiff to Jeffrey Borkoski, M.D., a neurologist, at Southeastern Neurology in Gainesville, Florida.   R. 448-49. Dr. Borkoski's impressions included idiopathic intermittent bilateral upper extremity numbness and normal electrodiagnostic studies.   R. 449.   Plaintiff had several return visits with Mark. H. Werner, M.D., also at Southeastern Neurology, including May 18, 2005.   R. 437-38.   Dr. Werner provided his impressions at that time that included a re-cap of Plaintiff's surgery and further noting that "[t]here appears to still be some residual muscle spasm and perhaps inflammation associated with healing" and "[h]istory of malingering."   R. 438.   Dr. Werner recommend that Plaintiff be restricted to work for eight hours of driving per day and lifting or carrying no more than one hour per day.   *Id.* Plaintiff continued to follow-up with Dr. Werner in 2006.   *See, e.g.*, R. 477-94.

On February 14, 2006, Dr. Werner noted that at his last visit six weeks ago, Plaintiff's

> neck and back pain had worsened after his job had been changed from driving
> down the highway to driving on site hauling clay.   There were many bumps in the
> non-paved roads, and he reported only being able to work 4 hours/day.   I wrote
> him a note recommending that he be off work for 2 weeks and then return to work
> driving on the highway only.   He did this, and now is back working on the highway.

R. 493.   Plaintiff reported neck pain three to four times a week.   He takes Anaprox DS as needed and this worked "fairly well for the pain.   Plain has been running 6-7/10 in intensity."   *Id.*   Plaintiff reported doing his exercises two times a week, but was told to do them every day.   Plaintiff is tired when he gets home from work and "sometimes neglects to do his exercises.   Sometimes he may call in when his neck is hurting and he won't come to work."   *Id.*   Plaintiff had mild tenderness to percussion of the lower cervical spine; motor power was 5/5 throughout without pronator drift; he was able to walk on his heels and toes; and his gait and tandem gait were normal.   R. 493-94.

Dr. Werner opined that Plaintiff's pain had stabilized and he "judge[d] him to be at maximal medical improvement [MMI]."   R. 494.   Plaintiff was counseled to do his physical therapy exercises on a daily basis, continue taking Anaprox as needed for pain and perhaps to continue on this medication for ten years, and that it was "fine for him to continue working 8 hours/day driving on the highway."   *Id.*

As of March 28, 2006, Dr. Werner opined that Plaintiff was stabilized and remained at MMI and "physically able to work and [he did not] think he is disabled because he is no longer employable."   R. 492.   In May through August 2006 Plaintiff had follow-up visits with Dr. Werner, reporting in August 2006 chronic neck pain subsequent to the 2004 motor vehicle accident that Dr. Werner felt could be related to chronic facet pain.   It was also reported that Plaintiff had persistent numbness of the arms, though intermittent, with sensory los that could be due to carpal tunnel syndrome or cervical spondylosis with radiculopathy.   Plaintiff also admitted "to some depression.   He denies suicidal ideation. He is under some financial stress related to his decreased work hours."   R. 477.

Medications included Ultracet as needed for pain.   R. 478.   Further studies were

planned such as an EMG/NCV, to check Plaintiff's left arm first and if normal, further

studies would probably not be needed.   He was referred to

Dr. Guskiewicz for an evaluation of possible facet injection and to return in four to six

weeks.   R. 478.[8]   This appears to be Plaintiff's last reported visit with Dr. Werner.   *See*

doc. 12-1 at 1-3.

On July 24, 2007, Plaintiff voluntarily presented to Meridian Behavioral Healthcare,

Inc. for an intake and screening mental health evaluation.   R. 528-30.   It was reported

that Plaintiff had not worked since the 2004 accident.   R. 528.   Plaintiff reported "some

symptoms of depression and mood swings prior to the accident, but reports that the

symptoms have gotten worse since the accident."   Plaintiff reported a history and

numerous symptoms.   After reviewing information from Plaintiff, the evaluator noted the

most fitting diagnoses of schizoaffective disorder, with a rule out of psychotic disorder,

NOS (not otherwise specified).   *Id.*   Plaintiff was assigned a current Global Assessment

of Functioning (GAF) score of 40 and a score of 50 as a highest or past year GAF score.

R. 522, 529.[9]   Plaintiff was admitted in the AOP program and would be seen by the

---

[8]   On July 17, 2006, Dr. Werner wrote that a functional capacity evaluation on
June 6, 2006, noted inappropriate pain behaviors such that Plaintiff "should be able to
perform light PDC work with occasional below waist lifting to 25 lbs.   It indicated that the
client could walk and sit for frequent intervals.   They noted a non-antalgic gait and
functional balance."   Dr. Werner cancelled the EMG/NCV tests opining that they were
not necessary at that time.   R. 479; *see* R. 478.

[9]   The American Psychiatric Association: *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF scale that
is primarily used by mental health practitioners.   The GAF Scale is used to report "the
clinician's judgment of the individual's overall level of functioning" (with regard to only

evaluator and an appointment was set up with a psychiatrist.   The prognosis was fair.

R. 529.[10]   It appears Plaintiff had an uneventful visit at Meridian in August 2007.   R.

---

psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."   *See* DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.   *Id.*   *See* <u>Nichols v. Astrue</u>, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).   A score of 21-30 refers to behavior that "is considerable influenced by delusions or hallucinations OR serious impairments in communication or judgment   . . . OR inability to function in almost all areas."   DSM-IV-TR 34.   A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."   *Id.*   A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*   A GAF scale rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships.   *Id.*

The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"   <u>Wind v. Barnhart</u>, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.   In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")."   DSM-5 at 16; *see* <u>Finley v. Colvin</u>, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

[10]   An initial evaluation report noted that Plaintiff's dress and grooming was acceptable; his motor behavior was appropriate; general attitude and behavior was cooperative, friendly, and attentive; speech was appropriate; thought content was unremarkable; thought process was concrete, loosening of associations, and racing thoughts; his perception was visual and auditory (he hears voices, talks to himself, sees things like walls moving or a light is shrinking, and walls closing in but not a cause of

511-15.   Although there is a note stating an "update due" for January 28, 2008, it also appears Plaintiff's last treatment at Meridian was in August 2007.   R. 38, 509.   It was represented during the hearing that Plaintiff did not have money to go back for treatment and that transportation was an issue for him.   R. 17, 37.[11]

On October 1, 2007, Eftim Adhami, M.D., conducted a medical evaluation of Plaintiff.   R. 531-35.   Plaintiff's chief complaint as a reasons for not working included certain "functional restrictions, examples of activities" such as Plaintiff reporting "feeling depressed most of the time; his mind wanders; says things seem to move around; sometimes gets cramps in his neck."   R. 531.   The results of the physical examination were generally normal.   *Id.*   The diagnosis was depression, needs mental health evaluation; s/p cervical spine fusion of the neck; and obesity.   R. 532.   Plaintiff's range of motion was normal.   R. 533-35.

---

anxiety; oriented as to place, time, and, place, and situation; memory and concentration not intact; abstraction and problem solving intact; affect was normal/broad, labile, and incongruent; and mood was unremarkable, angry, anxious, labile, and overwhelmed.   R. 517.   Plaintiff reported loving life; degree of hopelessness was low; attributed finances and pain to contributing to physical and psychological factors; never had attempts/gestures/ideation; low suicide risk; not a risk for violent behavior.   R. 518.   His insight was good, although he reported that he needs help.   R. 519.   He was amenable to work on problems.   His judgment was poor sometimes and exercised bad judgment when it came to relationships.   *Id.*   Plaintiff's reported challenges were depression and pain and "not being able to stop."   R. 520.   There was no reported psychiatric history.   *Id.*

[11]   During the hearing, Plaintiff's representative told the ALJ that Plaintiff has been "treating long term with Meridian" and that their records are entitled to great weight.   R. 34.   Plaintiff self-referred to Meridian in 2007 and had no further follow-up.   R. 512, 516, 526.   At that time, Plaintiff's mental status functioning was normal.
R. 516.   Although referred for an appointment with a psychiatrist (an acceptable medical source) for a trial of Abilify, Plaintiff did not return.   R. 515, 522.   The ALJ was also told that Meridian refused to complete a mental residual functional capacity statement.   R. 34.

There is a gap in the medical evidence between Plaintiff's evaluations at Meridian in 2007 until he presented to the emergency department at North Florida Regional Medical Center (North Florida) in Gainesville, Florida, on April 1, 2009, complaining of chest pain that started about one week ago and was gone.   R. 549.   After examination and various tests, Plaintiff was discharged in stable condition.   The clinical impressions were atypical chest pain; probable gastroesophageal, reflux disease; doubt new onset angina; and chest pain.   It was suggested that Plaintiff take Zantac or Prilosec.   R. 552.

On July 11, 2010, Plaintiff again presented to the emergency department at North Florida when he complained of chest pain.   R. 541.   The pain started a week prior but was gone.   The onset was abrupt and located in the left chest area.   *Id.*   At its worse, the severity was rated as moderate.   *Id.*   A review of symptoms revealed Plaintiff had a moderate occipital headache, no chills, cough, or difficulty with urination.   He was dizzy for several weeks and started "on BP meds x1 month."   All systems were otherwise negative, except as noted.   *Id.*   It was determined that Plaintiff was oriented to person, place, and time; gave appropriate answers and rational explanation of refusal of care; spoke coherently.   R. 546.   There was no sign of psychosis, suicidal or homicidal ideations, but delusional thinking was present.   *Id.*   The clinical impressions were chest pain, vertigo, and hypertension.   Plaintiff was discharged in stable condition and prescribed Metoprolol for 30 days with no refills and Antivert as needed for dizziness with no refills.   *Id.*   A CT scan of Plaintiff's brain without contrast was negative.   R. 556.   It appears that a chest x-ray indicated there was no evidence of acute cardiopulmonary process.   R. 557; *see* R. 558 (similar negative finding in April 2009).

On November 9, 2010, Plaintiff presented to Lance Chodosh, M.D., at the request of the state agency.   R. 564; *see* R. 18.   Dr. Chodosh remarked that Plaintiff provided a "vague and limited history," although a history of his problems is noted. R. 564.   Plaintiff confirmed that he last worked approximately six years ago after the 2004 accident.   *Id.*   He lives alone, is a high school graduate, and is literate.   *Id.*; *see* R. 303 (standard high school diploma).   Dr. Chodosh noted that Plaintiff was "independent in activities of daily living."   R. 564.   It is reported that Plaintiff's pain and dizziness limit him to walking one block; pain limits him to standing for 45 minutes; he cannot sit for extended periods of time because of pain; he can bend over at the waist and can squat, although with pain; he can lift at least 15 pounds; hand function is normal, including strength and dexterity; he is able to drive; vision, hearing, and speech are normal.   *Id.*

Dr. Chodosh completed a range of motion form.   R. 559-62.   He explicitly noted that Plaintiff exhibited "mild" pain behavior and had a "slightly" limiting functional assessment.   R. 565.   Upon examination, Plaintiff had normal physical functioning. R. 566.   Dr. Chodosh diagnosed neck, head, and extremity pain of uncertain etiology, without physical signs of impairment.   He also noted potential psychiatric issues and that a separate psychological assessment is indicated.   R. 566-67.   (Dr. Chodosh emphasized that the cause of Plaintiff's current neck pain is "unknown" as it dates back to a work-related injury that occurred six years ago and was last treated several years ago, although he noted that Plaintiff stated he could not afford medical care.   R. 564.)   Dr. Chodosh concluded that "[b]ased only on objective evidence this person is able to stand,

walk, sit, stoop, squat, kneel, lift, carry, handle objects, see, hear, and speak normally."[12]
R. 567.   Dr. Chodosh noted regarding his range of motion examination of Plaintiff's neck
that is decreased by pain, R. 565, however, that the "assessment activity could not be
completed because claimant complained of pain, or requested that it be stopped."   R.
566.

Approximately one week later, Plaintiff presented to Dr. Humphreys for a
psychological consultation.   R. 570; *see* R. 18.   Dr. Humphreys noted that Plaintiff
reportedly was able to care for his personal needs, drive, shop, cook, and clean his home.
*Id*.   He spends his time with his girlfriend and dogs, attends church on Sundays, and
talks to his mother and sister on the telephone.   R. 571.   Plaintiff also reported arrests
for cannabis possession, violations of probation, and other charges.   *Id*.   He drank
one-to-two beers daily and last smoked marijuana four months earlier. Upon mental
status testing, Plaintiff appeared depressed, but had logical and goal-oriented thought
processes, with no peculiarity or bizarreness and good insight and judgment.   Dr.
Humphreys noted that Plaintiff's "reported symptoms" were consistent with depressive
disorder, NOS, and nightmare disorder; his mood likely impacts his perception of pain.
R. 572.   Dr. Humphreys summarized that Plaintiff's concentration and memory "may"
impact his ability to carry out "complex" instructions and his social skills and judgment

---

[12]   The ALJ stated that "[n]o treating or examining physician has said the claimant
is completely unable to work."   R. 19.   The ALJ then referred to
Dr. Chodosh's findings and determined that Dr. Chodosh's "assessment is consistent
with the medical evidence of record, which shows that the claimant has not sought
treatment for any impairment."   *Id*.

may be affected by his mood.[13]   The prognosis and recommendations were largely

contingent upon his general medical condition.   R. 572.

Based upon the above described record, Catharina Eeltink, Ph.D., reviewed

Plaintiff's record and completed a Psychiatric Review Technique (PRT) and mental RFC

assessment.   R. 576-93.   Dr. Eeltink assessed that Plaintiff had no more than mild to

moderate limitations in work-related mental functioning.   R. 586, 590-91.   Dr. Eeltink

opined that Plaintiff "would be able to remember and carry out short and simple

instructions"; "may have some difficulty with more complex instructions due to reduced

concentration"; "may have some difficulty sustaining attention and concentration for

extended periods and completing a workday at a reasonable pace"; "may have difficulty

dealing with the public"; "may have some difficulty adapting to change"; and "[o]verall,

claimant would be able to complete simple tasks on a continuing basis from a mental

standpoint."   R. 592.

Approximately two months later, Bruce Hertz, Ph.D., another disability expert,

reviewed the record, completed a PRT and a mental RFC assessment and assessed that

Plaintiff's mild to moderate mental work-related limitations would not prohibit him from

carrying out basic daily instructions and tasks.   R. 594-611; *see* R. 606 and 610

(consultant's notes).   Dr. Hertz concluded his mental RFC assessment opining that "[t]he

---

[13]   The ALJ referred to Dr. Humphreys' evaluation, R. 18-19, and gave this assessment "some weight," but further stated: "However, as noted above, the claimant has not sought treatment for his mental impairments and he does not require any medication for treatment.   Nevertheless, the undersigned has considered this opinion in the [RFC] assessment.   (Exhibits 8F and 9F)[.]"   R. 19-20.

overall limitation is that while this claimant does have some functional limitations, those limitations will not prohibit carrying out basic daily instructions and tasks."

R. 610.   The ALJ referred to Dr. Hertz' opinion and stated "that while the claimant does display some mental deficits, those deficits are not significant enough to meet or equal a listing (Exhibit 12F)."   R. 20, 606.   The ALJ gave this opinion "significant weight as it is supported by the objective medical evidence."   R. 20.

On February 22, 2011, Olga M. Garcia, M.D., provided a case analysis and cryptically stated that the "RFC of 11/30/10 is affirmed as written."   R. 612.

In April 2011, Plaintiff presented to a registered nurse with complaints of neck and shoulder pain.   R. 614; *see* R. 18-19.   The nurse noted that Plaintiff's mood and affect were appropriate to the situation with no gross motor dysfunction.   R. 615.   Other than tenderness, Plaintiff's physical examination was unremarkable.   *Id.*   Plaintiff was diagnosed with hypertension and chronic neck and right shoulder pain.

R. 617; *see* R. 18.   The ALJ stated that this visit "did not require significant intervention."   R. 19.

## V.   Plaintiff's Hearing Testimony and the Vocational Expert's Testimony

### A.   Plaintiff's Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony.   R. 17-18; *see* R. 39-73, 75.

At the hearing, the claimant testified that he lives with his girlfriend.   He indicated that he graduated from high school.   He smokes and drinks occasionally.   He has used marijuana, most recently, a week prior to the hearing.   He indicated that he uses marijuana about four times a month.   The claimant testified that he gets food stamps and help from his family and friends.   The claimant stated that he is able to do his own personal hygiene.   His girlfriend sometimes helps him put on his clothes.   He can clean the house and use the vacuum cleaner.   The claimant testified that he goes to visit family and friends and to doctor appointments.   He

watches football on television and attends church.   The claimant stated that he has a bulldog and takes walks around the neighborhood. He cannot be on his feet more than 35-40 minutes and then, he becomes tired. He drives three times a week.   The claimant stated that he can lift/carry a gallon of milk.   He was last treated at Meridian Behavioral in 2007.   He did not have the money to go back for treatment.   He said that he becomes depressed because people do not believe him.   He does not take any medication for mental problems.   He takes medicine for high blood pressure.   He has also not been treated for physical problems since 2007.   He does not have money or insurance.   The claimant indicated that the reason he does not work is his neck pain.   The claimant stated that he is depressed and thought about killing himself.   He is tired.

He has worked in construction in the past where he drove a dump truck.   He had a CDL license.   He also worked at Bob Evans as a dishwasher.   The claimant testified he worked as a prep cook at Perkins.   He stopped working as a driver because of a work-related injury and received worker's compensation as a result.

R. 17-18.   (Plaintiff collected a $22,000 lump sum worker's compensation settlement for his neck injury in 2004.   R. 49.)

## B.   The Vocational Expert's Testimony

The vocational expert classified Plaintiff's past work that included work as a dump truck driver, <u>Dictionary of Occupational Titles</u> (DOT) number 902. 683-010, which is a medium category and unskilled, with an SVP of 2.   R. 74.   Other past work included that of a sweeper or picking up paper and dishwasher.   R. 74-75.

The vocational expert was asked the following hypothetical questions:

Q Let me have you assume that the claimant has a residual functional capacity perform medium work; can lift or carry 50 pounds occasionally, 25 pounds frequently; stand or walk for six hours and sit six hours in an eight hour work day, with unlimited push/pull capability; and mentally would be limited to simple, routine, repetitive tasks; concentrate and persist for two hour segments; would be limited to occasional changes in the work setting, and occasional interactions with the public, coworkers and supervisors; and would not be able to meet fast paced, high production demand work.   Assuming these limits, can the claimant perform any of his past work as it was actually or is generally performed?

A The dump truck driver would conform to that, your honor.   Sweeper or picking up the paper would conform to that.   These two definitely, your honor.

Q Dishwasher?

A That would be around people too much –

Q Okay.

A - I don't feel comfort and able with that.

Q All right.   And assume I find the claimant is not capable of working for eight hours a day, 40 hours a week, or the claimant has a substantial loss in the ability to perform at least one of the basic mental demands for unskilled work.   Under these scenarios, either separately or together, would there be any jobs that could be performed?

A No, sir, they'd be unemployable.

ALJ: And if you have any questions.

ATTY: Just one question, your honor.

**Examination of Vocational Expert by Claimant's Attorney**

Q Mr. Strader, if we added to the hypothetical a person who, due to pain or distractions due to depression would be off task at least 50 percent of the day - that would be a marked impairment in maintaining concentration, persistence and pace -- would that change in testimony at all?

A I think at that stage a person would not be able to maintain employment.

ATTY: Nothing further, your honor.

R. 76-77.   The representative provided a closing argument.   R. 77-78.

## VI.   The ALJ's Credibility Findings

The ALJ considered Plaintiff's testimony in light of the medical and other evidence

and made several credibility findings:

The undersigned finds the claimant's allegations regarding his symptoms and limitations not credible to the extent he claims he is precluded from all work activity. The objective medical evidence in the record fails to establish an underlying medical condition that could reasonably be expected to produce incapacitating pain.   Despite the claimant's allegations of incapacitating pain, no doctor has found that he needs surgery since his alleged onset date.   He has a remote history of cervical surgery.   The undersigned has carefully reviewed the claimant's subjective complaints in accordance with the guidelines provided by Social Security Ruling 96-7p and regulations 20 CFR 404.1529 and 416.929, Likewise, the undersigned has also taken into consideration the controlling case law in the Eleventh Circuit regarding the standard used to assess subjective complaints of pain and other symptoms.   This standard requires evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain.

The claimant has had little medical treatment for any impairment.   He indicated that he has not been to the doctor since 2007 at hearing.   [A 2005 note from his treating neurologist found "neuropsychological testing was consistent with malingering" (Exhibit 3F).   While this is before the alleged onset date, the finding of malingering nevertheless diminishes the claimant's credibility.]   Records do show he presented to the health department for complaints of neck and shoulder pain in 2011.   He did not require significant intervention.   During a consultative examination, the examiner indicated the claimant's physical examination did not show signs of impairment.   In addition, the claimant indicated that he only takes medication for high blood pressure.   Despite his allegations of depression, he admits he has not been to Meridian since 2007 and takes no medication. Although the undersigned recognizes that the claimant has some degree of impairment, the objective and other evidence simply does not establish that his symptoms are as disabling as the claimant alleges.

The claimant's credibility is further diminished by his inconsistent statements regarding his activities of daily living that include cooking, cleaning, and driving, In completing a function report the claimant's girlfriend indicated that he attends football games weekly (Exhibit 6E).   At hearing, the claimant indicated that he no longer attends football games.   Nevertheless, the claimant's level of activity is not consistent with a complete inability to work.   The claimant further indicated that he

is able to visit friends and family and attends church.   The claimant also admitted to using marijuana several times a month and drinking alcoholic beverages.

No treating or examining physician has said the claimant is completely unable to work.   When Dr. Chodosh completed his consultative physical examination of the claimant, he indicated that the claimant is able to stand, walk, sit, stoop, squat, kneel, carry, handle objects, see, hear, and speak normally.   This assessment is consistent with the medical evidence of record, which shows that the claimant has not sought treatment for any impairment.   Regarding his mental functioning, when Dr. Humphreys evaluated the claimant for a consultative examination, she indicated that the claimant's concentration and memory appeared impaired and may impact his ability to carry out complex instructions.   She also indicated that his social skills and judgment may be affected by his mood.   This assessment was given some weight.   However, as noted above, the claimant has not sought treatment for his mental impairments and he does not require any medication for treatment.   Nevertheless, the undersigned has considered this opinion in the residual functional capacity assessment. (Exhibits 8F and 9F)[.]

The state agency medical consultant did not issue an opinion regarding the claimant's physical functioning.   Regarding the claimant's mental functioning, the state agency consultant concluded that while the claimant does display some mental deficits, those deficits are not significant enough to meet or equal a listing (Exhibit 12F) [The claimant's representative requested a mental RFC assessment from the CE examiner.   The undersigned denied this request based on the availability of mental RFC assessments provided by the state agency consultants.] This opinion is given significant weight as it is supported by the objective medical evidence.

In sum, the above residual functional capacity assessment is supported by the record as a whole.

R. 19-20.

## VII.  Legal Analysis--Substantial Evidence Supports the ALJ's Hypothetical Question Posed to the Vocational Expert

Plaintiff argues that the hypothetical question posed by the ALJ to the vocational

expert was incomplete because the question did not include all of Plaintiff's impairments,

namely Plaintiff's "'moderate ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace

**without an unreasonable number and length of rest periods**; (emphasis added) and his moderate ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances a moderate ability.'"   Doc. 16 at 16-17. For Plaintiff, the ALJ "left out" most of Plaintiff's limitations.   Doc. 16 at 17.

The ALJ recognized that Plaintiff exhibited several severe limitations that affected his ability to perform basic work activities.   R. 15; *see* 20 C.F.R. § 404.1520(c).   The ALJ discussed the relevant evidence including the objective medical evidence, Plaintiff's reported daily activities, and Plaintiff's hearing testimony and his credibility.   R. 16-20. The ALJ determined this evidence did not demonstrate Plaintiff's condition precluded him from working.   *Id.*   Substantial evidence supports this conclusion.

Consistent with the evidence, the ALJ accounted for Plaintiff's moderate difficulties in social functioning and regarding his concentration, persistence, or pace by including, among other factors, in his hypothetical question to the vocational expert that Plaintiff "mentally would be limited to simple, routine, repetitive tasks; concentrate and persist for two hour segments; would be limited to occasional changes in the work setting, and occasional interactions with the public, coworkers and supervisors; and would not be able to meet fast paced, high production demand work."   R. 76.   These factors are included in the ALJ's RFC determination.   R. 17.

In response to the hypothetical question, the vocational expert opined that Plaintiff could be perform his past relevant work as a dump truck driver.   R. 76.   At step 4, the ALJ agreed.   R. 20.

The vocational expert is a specialist in employment and vocational factors influencing employment.   *See* Phillips, 357 F.3d at 1240.   The hypothetical question posed to the vocational expert was consistent with the ALJ's findings based on the medical and other evidence of record, and the ALJ's credibility findings.   *See* Smith v. Comm'r of Soc. Sec., 486 F. App'x 874, 876 (11th Cir. 2012) (unpublished).   Plaintiff has not demonstrated the ALJ erred in posing the hypothetical question to the vocational expert and determining that Plaintiff is capable of performing past relevant work.   The ALJ's decision is supported by substantial evidence and he appropriately applied controlling law.

## VIII.   Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.   Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits should be **AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on April 29, 2014.


**s/   Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**